## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

VIRGIN MOBILE USA, L.P.,

                    Plaintiff,

      v.

STATE OF INDIANA, and
INDIANA STATEWIDE 911 BOARD,

                 Defendants.

CIVIL ACTION NO. 15-cv-1105

**PUBLIC VERSION**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
## INJUNCTION

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................. 1

STATEMENT OF FACTS ...................................................................... 3

    A.    HISTORY OF THE LIFELINE PROGRAM ...................................... 3

    B.    ASSURANCE WIRELESS .................................................... 5

    C.    THE 911 FEE IMPOSED BY AMENDED SECTION 11 TARGETS LIFELINE PROVIDERS ................................................... 8

ARGUMENT ................................................................................ 11

I.    SPRINT HAS A LIKELIHOOD OF SUCCESS ON THE MERITS ........................... 12

    A.    Amended Section 11 Is Preempted By Federal Law ........................ 13

        1.    FCC Rules And Regulations Prohibit Lifeline Providers From Collecting The $1.00 911 Fee From Consumers ................... 14

        2.    Requiring Lifeline Providers To Pay The $1.00 911 Fee Will Frustrate The Congressional Purpose Of Providing Lifeline Services In The State Of Indiana ................................. 17

    B.    Amended Section 11 Violates the Fourteenth Amendment's Equal Protection Clause ................................................... 18

        1.    Disparate Liability Exposure Treats Lifeline Providers As A Singled Out Class ............................................. 19

        2.    The Disparate Treatment of Lifeline Providers Is Not Rationally Related To A Legitimate Goal ................................. 22

II.    AMENDED SECTION 11 WILL CAUSE IRREPARABLE INJURY IF IT IS ALLOWED TO TAKE EFFECT ............................................... 25

III.    THE BALANCE OF EQUITIES AND PUBLIC POLICY FAVOR AN INJUNCTION ................................................................... 27

CONCLUSION .............................................................................. 28

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*7-Eleven, Inc. v. Spear*,
No. 10-cv-6697, 2011 WL 830069 (N.D. Ill. Mar. 3, 2011) ................................. 12

*Abbott Labs. V. Mead Johnson & Co.*,
971 F.2d 6 (7th Cir. 1992) ......................................................................... 11, 12

*Baskin v. Bogan*,
983 F. Supp. 2d 1021 (S.D. Ind. 2014) ........................................................ 11, 12

*City of Cleburne v. Cleburne Living Center*,
473 U.S. 432 (1985) ........................................................................................ 18

*Consolidated Edison Co. of New York, Inc. v. Pataki*,
117 F. Supp. 2d 257 (N.D.N.Y. 2000) ................................................... 22, 23, 24

*Crosby v. National Foreign Trade Council*,
530 U.S. 363 (2000) ........................................................................................ 13

*Fidelity Federal Savings & Loan Association. v. De la Cuesta*,
458 U.S. 141 (1982) ........................................................................................ 13

*Florida Lime & Avocado Growers, Inc. v. Paul*,
373 U.S. 132 (1963) ........................................................................................ 13

*Geier v. American Honda Motor Co.*,
529 U.S. 861 (2000) ........................................................................................ 17

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of America,
Inc.*, 549 F.3d 1079 (7th Cir. 2008) ................................................................. 11

*Hines v. Davidowitz*,
312 U.S. 52 (1941) .......................................................................................... 13

*Iowa Utilities Board. v. FCC*,
109 F.3d 418 (8th Cir. 1996) ........................................................................... 25

*Jones v. Rath Packing Co.*,
430 U.S. 519 (1977) ........................................................................................ 17

*Kastanis v. Eggstacy LLC*,
752 F. Supp. 2d 842 (N.D. Ill. 2010) ............................................................... 27

*Keesling v. Tipton County Plan Commission*,
No. 14-cv-01628, 2014 WL 5846740 (S.D. Ind. Nov. 12, 2014) ......................... 12

*Long Island Lighting Co. v. Cuomo*,
   666 F. Supp. 370 (N.D.N.Y. 1987) ...................................................................23

*Merrill Lynch v. Salvano*,
   999 F.2d 211 (7th Cir. 1993) .........................................................................25

*Minnesota v. Clover Leaf Cremery Co.*,
   449 U.S. 456 (1981) ........................................................................................24

*Miyano Machinery USA, Inc. v. Miyanohitech Machinery, Inc.*,
   576 F. Supp. 2d 868 (N.D. Ill. 2008) .............................................................11

*Nextel Partners, Inc. v. Town of Amherst, NY*,
   251 F. Supp. 2d 1187 (W.D.N.Y. 2003) .........................................................18

*Planned Parenthood v. Doyle*,
   162 F.3d 463 (7th Cir. 1998) .........................................................................27

*PLIVA, Inc. v. Mensing*,
   131 S. Ct. 2567 (2011) ...................................................................................17

*Reed v. Reed*,
   404 U.S. 71 (1971) ..........................................................................................22

*Santos v. City of Houston, Texas*,
   852 F. Supp. 601 (S.D. Tex. 1994) ................................................................24

*SEC v. Advance Growth Capital Corp.*,
   470 F.2d 40 (7th Cir. 1972) ......................................................................27, 28

*Smith v. City of Chicago*,
   457 F.3d 643 (7th Cir. 2006) .........................................................................19

*Srail v. Village of Lisle, Illinois*,
   588 F.3d 940 (7th Cir. 2009) .........................................................................18

*Tennessee Valley Authority v. Hiram Hill et al.*,
   437 U.S. 153 (1978) ........................................................................................27

*Texas Office of Public Utilities Counsel v. Federal Communications Commission*,
   183 F.3d 393 (5th Cir. 1999) ...........................................................................3

*Ty, Inc. v. Jones Group, Inc.*,
   237 F.3d 891 (7th Cir. 2001) .........................................................................12

*Ty, Inc. v. West Highland Publishing, Inc.*,
   No. 98 C 4091, 1998 WL 698922 (N.D. Ill. Oct. 5, 1998) ........................25, 27

*United States v. Oakland Cannabis*,
    532 U.S. 483 (2001) ..........................................................................................27

*United Asset Coverage, Inc., v. Avaya Inc.*,
    409 F. Supp. 2d 1008 (N.D. Ill. 2006) ...............................................................26

*United States Department of Agriculture v. Moreno*,
    413 U.S. 528 (1973) ..........................................................................................22

*Vision Church v. Village of Long Grove*,
    468 F.3d 975 (7th Cir. 2006) ...........................................................................18

**Statutes**

47 USC § 254.............................................................................................*passim*

I.C. § 36-8-16.6-9.............................................................................................10

I.C. § 36-8-16.6-11......................................................................................*passim*

I.C. § 36-8-16.6-12...........................................................................................10

I.C. § 36-8-16.7-29.............................................................................................9

I.C. § 36-8-16-7-32 ..................................................................................9, 10, 20

II.C. § 36-8-16.7-33 ................................................................................9, 10, 20

I.C. § 36-8-16.7-34..........................................................................................9, 21

**Other Authorities**

U.S CONST. art. VI, cl. 2. ................................................................................13

U.S CONST. amend. XIV, § 1............................................................................18

47 C.F.R. § 54.400 .............................................................................................3

47 C.F.R. §54.403 .......................................................................................14, 15

*In re Federal-State Joint Board on Universal Service Lifeline and Link Up*,
    25 FCC Rcd. 15598 (F.C.C. November 4, 2010)..................................................4

*In re Lifeline and Link Up Reform and Modernization*,
    2015 WL 3884807 (F.C.C. June 22, 2015)..................................................3, 4, 5

*In re Lifeline and Link Up Reform and Modernization*,
    26 FCC Rcd. 9022 (F.C.C. June 21, 2011)..........................................................4

*In re Lifeline and Link Up Reform and Modernization*,
    27 FCC Rcd. 6656 (F.C.C. February 6, 2012) ............................................................ 3, 4, 16

Plaintiff Virgin Mobile USA, L.P. ("Virgin Mobile" or "Plaintiff"), through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 65(a) and (b) and Local Civil Rule 65-2, submits this memorandum of law in support of its motion for a temporary restraining order and preliminary injunction to enjoin Defendants the State of Indiana (the "State"), and the Indiana Statewide 911 Board (the "911 Board") (collectively the "Defendants") from implementing and enforcing changes made by Public Law 157-2015 to the Indiana Enhanced Prepaid Wireless Telecommunications Service Charge Act, Ind. Code § 36-8-16.6-11, which became effective July 1, 2015.

## PRELIMINARY STATEMENT

Congress enacted the federal Lifeline Assistance program in 1985 in the hope that no American, no matter how economically disadvantaged, would be forced to live without the modern necessity of telephone service. Congress recognized that access to telephone service was required to fully participate in contemporary American social and economic life. Thirty years later, an estimated 3% of Indiana households still do not have telephone service.[1] Because of recent action by the Indiana Legislature to enact a discriminatory fee targeted at a subset of telecommunications companies that specifically serve economically disadvantaged households, an additional 7% of all households in Indiana are at risk of losing their telephone service. *Id.* Should the law be implemented, by the end of September 2015, a full 10% of the households in Indiana -- the poorest households in the state -- may be faced with telephone companies that no longer are able to economically serve them. *Id.*

Indiana law imposes a surcharge on telecommunications consumers to recover the cost of establishing a 911 emergency services telephone system. At issue in this case is the unlawful

---

[1] State and Country QuickFacts: Indiana, U.S. Census Bureau, (last revised May 28, 2015), http://quickfacts.census.gov/qfd/states/18000.html.

enactment of Public Law 157-2015, which amends I.C. § 36-8-16.6-11 of the Indiana Enhanced Prepaid Wireless Telecommunications Service Charge Act ("EPWTSCA" or "911 Service Charge Act") to impose retroactive and prospective surcharges on the providers of Lifeline service to economically disadvantaged households. If the revision to Section 11 is allowed to stand, Virgin Mobile's Lifeline service provider business will effectively be driven from Indiana's market through a fee recovery scheme that conflicts with federal law and which overtly discriminates, on its face, against Lifeline Providers, irreparably harming both Virgin Mobile and its Indiana low-income customers.

Amended Section 11 substantially and illegally interferes with the intentions of Congress in establishing the Lifeline program, which provides federal subsidies for telephone service. Further, the effect of Amended Section 11 is immediate. As of August 1, 2015, Amended Section 11 will retroactively charge Virgin Mobile and other Lifeline service providers a fee for each Indiana Lifeline customer for every month going back to the initial month of a Lifeline customer's current service agreement. I.C. § 36-8-16.6-11(e). As of September 1, 2015, Amended Section 11 will impose a monthly recurring charge of $1.00 on Virgin Mobile for each subscriber on whose behalf it receives $9.25 in federal subsidy from the Federal Communications Commission's Universal Service Fund. I.C. § 36-8-16.6-11(d). Notably, no other communications carrier that provides wireless or wireline services in Indiana is responsible for this $1.00 fee – the $1.00 fee is assessed on communications providers *only where* the Lifeline Provider receives "reimbursement from the universal service fund through the administrator designated by the Federal Communications Commission." *Id.* These discriminatory and unlawfully targeted modifications to Indiana law will impose unanticipated retroactive costs on Virgin Mobile that will make the provision of Lifeline services in the State of Indiana

uneconomical, reducing the availability of Lifeline benefits to consumers. Because of the timely and substantial issues at stake, it is both appropriate and necessary that this Court enjoin Amended Section 11 from taking effect pending this honorable Court's ruling on the underlying Complaint.

**STATEMENT OF FACTS**

**A.     HISTORY OF THE LIFELINE PROGRAM**

The term "universal service" dates back to the Communications Act of 1934 which vowed "to make available, so far as possible, to all the people of the United States, … a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." *Tex. Office of Pub. Util. Counsel v. FCC,* 183 F.3d 393, 405-06 (5th Cir. 1999) (quoting 47 U.S.C. §151) (alteration made to reflect 1934 text). To realize that vision, the Federal Communications Commission created the Universal Service Fund ("USF" or the "Fund") and formally established the Lifeline Assistance program ("Lifeline" or the "Program") in 1985. *In re Lifeline and Link Up Reform and Modernization*, 2015 WL 3884807, at *3, ¶ 2 (F.C.C. June 22, 2015). The Lifeline program provides universal access to low or no cost telephone service with funds from the Universal Service Fund. *In re Lifeline Reform*, 2015 WL 3884807, at *2, ¶ 1; Telecommunications Act of 1996, 47 U.S.C. § 254(b)(1)(3) (1996).

The Lifeline program fulfills Congress' mandate to ensure that all Americans are able to reap the benefits, opportunities and security that reliable phone service brings, including: being able to connect to friends and family, contact emergency services, and find and apply for jobs. 47 USC § 254(b); 47 C.F.R. § 54.400-417; *In re Lifeline and Link Up Reform and Modernization*, 27 FCC Rcd. 6656, at 6665, ¶ 17 (F.C.C. February 6, 2012). As the FCC has explained, "[i]n many cases, particularly for the elderly, poor, and disabled, the telephone [has] truly [been] a lifeline to the outside world … [a]ccess to telephone service has [been] crucial to full

3

participation in our society and economy which are increasingly dependent upon the rapid exchange of information." *In re Lifeline Reform,* 2015 WL 3884807, at *2, ¶ 1. Consistent with this strong public policy as embodied in the statute, federal law prohibits a state from adopting any law that impedes the ability of a carrier to provide the universal service benefit to eligible subscribers. 47 USC § 254(f).

Lifeline is available to eligible low-income consumers in every state, territory, commonwealth and on Tribal lands. *In re Lifeline Reform,* 2015 WL 3884807, at *2, ¶ 2. In 2005 Lifeline discounts were made available to qualifying low-income consumers on pre-paid wireless service plans in addition to traditional landline service. *In re Lifeline and Link Up Reform and Modernization,* 26 FCC Rcd. 9022, at 9024, ¶ 4 (F.C.C. June 21, 2011). Through Lifeline, qualifying low-income consumers are eligible to receive discounted wireless phone service, and from certain prepaid wireless providers, including Virgin Mobile, are able to obtain a set amount of free monthly phone service. *In re Lifeline Reform*, 2015 WL 3884807, at *3, ¶ 2. Eligible Telecommunications Carriers ("ETCs" or "Lifeline Providers"), such as Virgin Mobile, can apply to receive $9.25 from the federal Universal Service Fund which the Lifeline Provider then applies to the cost of providing services to qualifying households. 47 U.S.C. § 254(b); *In re Lifeline Reform,* 27 FCC Rcd. 6656, at 6663, ¶ 14. The Lifeline Provider directly passes this cost savings to the customer in the form of free or low-cost service. *In re Federal-State Joint Board on Universal Service Lifeline and Link Up*, 25 FCC Rcd. 15598, at 15627, ¶ 79 (F.C.C. Nov. 4, 2010). A Lifeline Provider can submit for reimbursement from the Fund for each of its customers who are enrolled in the Lifeline program. *Id*. Each Lifeline Provider is required to re-certify its subscribers each year. *In re Lifeline Reform,* 27 FCC Rcd. 6656, at 6690, ¶ 77.

To participate in the Lifeline program, a potential customer must either: (1) earn an income that is at or below 135% of the federal Poverty Guidelines (Arizona, California, Kansas, Michigan, New Mexico, Ohio, Texas, and Vermont require an income at or below 150% of the federal Poverty Guidelines while Nevada requires an income at or below 175% of the federal Poverty Guidelines); or (2) participate in a designated federal assistance program, such as Medicaid, Supplemental Nutrition Assistance Program ("SNAP"), Low-Income Home Energy Assistance Program ("LIHEAP"), Temporary Assistance to Needy Families ("TANF"), the National School Free Lunch Program, Food Distribution Program on Indian Reservations ("FDPIR"), or an enumerated state assistance program, if applicable. 47 C.F.R. § 54.400(j). For nearly 30 years, the Lifeline program has ensured that qualifying low-income Americans have the opportunities and security that voice service brings, including being able to find jobs, access to health care, and connect with family. *In re Lifeline Reform*, 2015 WL 3884807, at *2, ¶ 1.

## B.    ASSURANCE WIRELESS

"Assurance Wireless Brought To You By Virgin Mobile" ("Assurance") is a pre-paid Lifeline service offered by Virgin Mobile, which was designated by the Indiana Utility Regulatory Commission to act as a Lifeline Provider.[2] *In the Matter of Virgin Mobile USA, L.C. Petition for Limited Designation as an Eligible Telecommunications Carrier*, Indiana Utility Regulatory Commission, Cause No. 41052 ETC 55, *Assurance Petition*, (January 2010) ("*Indiana ETC Petition*"), attached hereto as Exhibit A. As of May 2015, Virgin Mobile provides Assurance Wireless Lifeline service in 40 states and the District of Columbia to over two million eligible needy households. *See* July 13, 2015 Declaration of Grace Boehm in Support of Motion for Temporary Restraining Order and Preliminary Injunction ("Boehm Decl."), attached hereto

---

[2] Virgin Mobile is a wholly-owned subsidiary of Sprint Corporation.

as Exhibit 1, at ¶ 5. Virgin Mobile's Assurance Wireless Lifeline service offering provides eligible customers with a free Assurance Wireless-branded handset, 250 anytime wireless voice minutes and unlimited text messaging per month at no charge. *In the Matter of Virgin Mobile USA, L.C. Petition for Limited Designation as an Eligible Telecommunications Carrier*, Indiana Utility Regulatory Commission, Cause No. 41052 ETC 55, Order at 9, (November 2010) ("*Assurance ETC Order*"), attached hereto as Exhibit B; Boehm Decl. ¶ 21. For an additional $5.00, subscribers can receive an additional 250 minutes per month, and for $30.00 subscribers can receive unlimited minutes and data on top of the base offer. Boehm Decl. ¶ 25. These additional packages may be added to an Eligible subscriber's plan by purchasing "Top-Up" cards from thousands of stores across the country, or from Virgin Mobile's website through the use of a credit card. Boehm Decl. ¶ 25.

The Indiana Utility Regulatory Commission determined that Assurance customers "will receive free service (so long as they do not exceed their [250] voice minute allotment) with no additional charges for taxes or activation." *Assurance ETC Order*, 9.

Assurance Wireless service offers free caller I.D., voicemail and call waiting. *Assurance ETC Order*, 3. Eligible customers are not required to enter into a long-term contract to receive service and can discontinue use of the service at any time, for any reason without penalty. *Assurance ETC Order*, 9. Prepaid service allows lower income consumers who may not have access to credit to obtain traditional postpaid service. *Id.* Customers can use their monthly minutes to place domestic long distance calls (intrastate and interstate). *In the Matter of Virgin Mobile USA, L.P. Petition for Limited Designation as an Eligible Telecommunications Carrier*, Submission of Responses to Interrogatories, Cause No. 41052-ETC-55, 1 (July 2010) ("*Assurance Interrogatory Responses*"), attached hereto as Exhibit C. To ensure that eligible

customers have continued and uninterrupted access to emergency services and customer care personnel, minutes used for calls placed to 911 emergency services or Virgin Mobile or Assurance Wireless customer service centers are not decremented from a customer's account. *Assurance Interrogatory Responses*, 1. Virgin Mobile does not and has never issued monthly bills to its Assurance Lifeline customers. *Assurance ETC Order*, 9; Boehm Decl. ¶ 21.

The Lifeline program exists to serve the nation's most vulnerable households. An estimated half-a-million Indiana households qualify for the Lifeline benefit, but of this number only 174,356 of these eligible households are enrolled currently in a Lifeline service, which is less than half the eligible population. Boehm Decl. ¶¶ 7-8. Over 50,000 of those enrolled in the Lifeline program are Assurance Wireless customers. Boehm Decl. ¶ 6. The average household income of an Assurance Lifeline subscriber is ███ and ███ of subscribers earn less than ███ which is significantly below the federal poverty level. Boehm Decl. ¶ 9. In fact, ███ of Assurance subscribers are enrolled in a public assistance program. Boehm Decl. ¶ 9. Furthermore, almost all of those subscribers receive food stamps or Medicaid support. *Id.* Many Assurance subscribers never owned a cell-phone before receiving their free Assurance services, due to financial constraints or poor credit history. Boehm Decl. ¶ 12. Before enrolling in an Assurance Lifeline plan, ███ of subscribers had gone over a year without phone service. *Id.* For ███ of Assurance subscribers, their Lifeline wireless service is the only phone service in their household. Boehm Decl. ¶ 10.

Due to these economic realities, ███ of Assurance subscribers do not pay for their Lifeline service and use the "free" 250 minute plan. Approximately ███ of Lifeline customers have never added money or minutes to their Assurance accounts. Boehm Decl. ¶ 28. Because Assurance does not require a credit check or payment information to enroll

in its 250 minute plan, the Company has a credit card on file for only ███ of its customers. Boehm Decl. ¶ 30. Of the small percentage of customers who did choose to Top-Up, the average amount added to their accounts in a single month was ███Boehm Decl. ¶ 29.

### C. THE 911 FEE IMPOSED BY AMENDED SECTION 11 TARGETS LIFELINE PROVIDERS.

As of July 1, 2015, Amended I.C. § 36-8-16.6-11 provides in relevant part (redline shows changes):

> Sec. 11. (a) The board shall impose an enhanced prepaid wireless charge on each retail transaction. ~~that occurs after June 30, 2010.~~ **Except as provided in subsection (e)**, the amount of the ~~initial~~ charge ~~imposed under this section may not exceed one half (1/2) of the monthly wireless emergency enhanced 911 fee assessed under IC 36-8-16.5-25.5 (before its repeal on July 1, 2012). The board shall increase the amount of the charge imposed under this section so that the amount of the charge imposed after June 30, 2012, under this section equals fifty cents ($0.50).~~ **is one dollar ($1).**
>
> \* \* \*
>
> (d) This subsection applies to a provider that is designated by the Indiana utility regulatory commission as an eligible telecommunications carrier for purposes of receiving reimbursement from the universal service fund through the administrator designated by the Federal Communications Commission. A provider:
>
> (1) is not considered an agency of the federal government for purposes of the exemption set forth in subsection (c); and
>
> (2) ~~is liable for the enhanced prepaid wireless charge imposed under this section~~ with respect to prepaid wireless telecommunications service provided **to end users** by the provider in its capacity as an eligible telecommunications carrier**, is liable for the enhanced prepaid wireless charge imposed under subsection (e).**
>
> **(e) A provider described in subsection (d) shall pay to the board the following charges:**
>
> **(1) Not later than August 1, 2015, a one (1) time charge equal to the product of the following factors:**
> **(A) The enhanced prepaid wireless charge established under subsection (a).**

**(B) The number of unique end users for which the provider received reimbursement from the universal service fund during the immediately preceding month.**

**(C) The number of months under the current service agreement between each end user described in clause (B) and the provider for which the provider has received reimbursement from the universal service fund before August 1, 2015.**

**(2) Beginning September 1, 2015, and on the first day of each month thereafter, a charge equal to the product of the following factors:**

**(A) The enhanced prepaid wireless charge established under subsection (a).**

**(B) The number of unique end users for which the provider received reimbursement from the universal service fund during the immediately preceding month.**

**The provider may bill and collect from each end user the charges calculated under this subdivision with respect to the end user. The provider shall determine the manner in which the provider bills and collects the charges. A provider may not bill and collect from an end user an amount greater than the charges paid by the provider to the board with respect to the end user.**

I.C. § 36-8-16.6-11.[3]

The 911 Fee generates funds that are deposited in the "statewide 911 fund established "for the purpose of creating and maintaining a uniform 911 system" managed by a 911 Board. I.C. § 36-8-16.7-29. The 911 Board also imposes a monthly fee on each "standard user" of non-Lifeline services. I.C. § 36-8-16.7-32. However, unlike the 911 Fee imposed on Lifeline Providers like Virgin Mobile under Section 11, the surcharge is imposed on the "standard user," not on the provider itself. I.C. § 36-8-16.7-33. Indiana Code § 36-8-16.7-34 makes clear that any 911 Fee imposed on the "standard user" is the liability of the "standard user," not the non-Lifeline Provider. Moreover, the non-Lifeline Provider is permitted to retain 1% of the collected fees to cover its costs of collecting and remitting the fee to the 911 Board. I.C. § 36-8-16.7-33.

---

[3] Original I.C. § 36-8-16.6-11 is attached hereto as Exhibit D; amended I.C. § 36-8-16.6-11 is attached hereto as Exhibit E.

There are two provisions of Amended Section 11 that, if implemented, will have a disproportionate effect on Assurance's Lifeline business and its ability to serve eligible and deserving customers in Indiana. First, no later than August 1, 2015, Virgin Mobile will be required to make a payment to the 911 Board of $1.00 for each Lifeline subscriber, times the number of months the subscriber has received Lifeline service under their current service agreement as of July 2015. I.C. § 36-8-16.6-11(e). This retroactive payment is due for every customer for which Virgin Mobile received reimbursement from the Universal Service Fund. *Id.*; Boehm Decl. ¶ 33.

Second, beginning on September 1, 2015, Virgin Mobile will be required to make a 911 Fee payment of $1.00 for each customer on which Virgin Mobile received reimbursement from the Universal Service Fund in August 2015; this payment obligation is imposed monthly thereafter, based on the number of end users for which Virgin Mobile receives reimbursement in the preceding month. I.C. § 36-8-16.6-11(d). These prospective and retroactive payments are obligations of Virgin Mobile directly, not its customers. *Id.* In all other circumstances under Indiana law, 911 Fees are imposed on consumers, not the wireline or wireless carriers. I.C. § 36-8-16-7-32; I.C. § 36-8-16.7-33; I.C. § 36-8-16.6-11. In all other circumstances, the incidence of the 911 Fee is when there is a "retail transaction" that allows the provider or the point of sales representative to collect the 911 Fee from the consumer and pay the funds to the State of Indiana. *See e.g.* I.C. § 36-8-16.6-12 (requires a seller to collect the 911 Fee from the consumer in a "retail transaction"); I.C. § 36-8-16.6-9 ("retail transaction" is defined as the "purchase of prepaid wireless telecommunications service from a seller…."). Notably, prior to July 1, 2015, non-Lifeline wireless subscribers paid only $0.50 per month, and wireline subscribers paid $0.90 per month. Boehm Decl. ¶ 31. With the retroactive payment of $1.00 per subscriber imposed by

I.C. § 36-8-16.6-11(e), Virgin Mobile will be contributing more per Lifeline customer than for any other customer in Indiana, and Virgin Mobile will be contributing $1.00 per month for some customers that have already paid $0.50 when they Topped-Up by purchasing additional minutes in a retail transaction. Boehm Decl. ¶ 31.

## ARGUMENT

A party seeking a preliminary injunction must demonstrate: (1) some likelihood of success on the merits; and (2) that no adequate remedy at law exists and that it will suffer irreparable harm if preliminary injunctive relief is denied. *Abbott Labs. V. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992); *Miyano Mach. USA, Inc. v. Miyanohitech Mach., Inc.*, 576 F. Supp. 2d 868, 878 (N.D. Ill. 2008). Before granting a preliminary injunction, a court is charged with analyzing the motion for preliminary injunction "in two distinct phases: a threshold phase and a balancing phase." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1085-86 (7th Cir. 2008). Under the threshold phase of the preliminary injunction analysis, a plaintiff must establish the following three requirements: "First, that absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims. Second, that traditional legal remedies would be inadequate. And third, that its claim has some likelihood of succeeding on the merits." *Id.* (citations omitted).

Once a court determines that the moving party has satisfied the threshold phase of the preliminary injunction analysis, the court then moves on to the balancing phase of the analysis. "The balancing phase requires the court to balance the harm to the moving party if the injunction is denied against the harm to the nonmoving party if the injunction is granted." *Baskin v. Bogan*, 983 F. Supp. 2d 1021, 1024 (S.D. Ind. 2014) (citation omitted). In this phase, the court "weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the

court were to grant the requested relief." *Girl Scouts*, 549 F.3d at 1086 (citation omitted). A court does so by employing a sliding scale approach, by which the "more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Id.* (citation omitted). During the balancing phase of the preliminary injunction analysis, a court must also consider "any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the 'public interest')." *Baskin*, 983 F.Supp.2d at 1024-25 (citation omitted); *accord Keesling v. Tipton County Plan Comm'n*, No. 14-cv-01628, 2014 WL 5846740, at *2 (S.D. Ind. Nov. 12, 2014).

Virgin Mobile is entitled to a preliminary injunction because: (1) there is a likelihood that Virgin Mobile will succeed on the merits of each of its claims or at least sufficiently serious questions going to the merits to make them a fair ground for litigation; (2) Virgin Mobile and the public are likely to sustain irreparable harm if Amended Section 11 is enforced; (3) the balance of hardships tips decidedly in Virgin Mobile's favor; and (4) the public interest strongly favors the issuance of a preliminary injunction. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

## I.      SPRINT HAS A LIKELIHOOD OF SUCCESS ON THE MERITS

A party is entitled to a preliminary injunction if it can demonstrate that its case has some likelihood of succeeding on the merits. *Abbott Labs*, 971 F.2d at 11. To show "some" likelihood of success, the party seeking the preliminary injunction need only demonstrate that it has a "better than negligible" chance of success. *Ty, Inc.*, 237 F.3d at 897; *see 7-Eleven, Inc. v. Spear*, No. 10-cv-6697, 2011 WL 830069, at *4 (N.D. Ill. Mar. 3, 2011) (noting that this is an "admittedly low requirement"). Virgin Mobile satisfies this standard, as Amended Section 11 is preempted by federal law and violates the equal protection clause of the Constitution.

### A.      Amended Section 11 Is Preempted By Federal Law

The Supremacy Clause of Article VI of the Constitution provides Congress with the power to preempt state law.  U.S CONST. art. VI, cl. 2.  Preemption occurs when there is outright or actual conflict between federal and state law, including cases where "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963), or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). Preemption may result not only from action taken by Congress itself, a federal agency acting within the scope of its congressionally delegated authority may preempt state regulation. *Fidelity Federal Savings & Loan Assn. v. De la Cuesta*, 458 U.S. 141, 154 (1982).

Congress expressly preempted state laws inconsistent with the federal mechanism to provide Lifeline service. 47 USC § 254(f). Section 254(f) of the Act provides that "A State may adopt regulations **not inconsistent** with the Commission's rules to preserve and advance universal service." *Id.* (emphasis added). Amended Section 11 imposes both a prospective and retroactive $1.00 911 Fee on the Lifeline Provider for each Lifeline subscriber, and requires the carrier to pay the 911 Fee from the $9.25 Lifeline benefit paid from Universal Service Funds to the Lifeline Provider. Imposing the $1.00 911 Fee directly to the Lifeline Provider stands as an obstacle to fulfilling Congress' intent to provide Lifeline services, and is therefore preempted, for two reasons. First, Section 254(e) of the Act requires a carrier who receives funds from the USF to use the funds "only for the provision, maintenance, and upgrading of facilities and services" for which the funds are intended. 47 USC § 254(e). Any state law requiring a carrier to

use funds received from the USF for anything other than the provision of Lifeline services is thus expressly preempted. FCC regulations further reflect this Congressional mandate, requiring Lifeline Providers to "pass through the full amount of support to the qualifying low-income consumer." *See* C.F.R. §54.403(a)(1). While the carrier may pass on the charges to consumers, federal law prohibits carriers from reducing the benefit to do so.

Second, because ███████ of Assurance Lifeline customers have access to a credit card, Boehm Decl. ¶ 10, it is impossible for Virgin Mobile to collect any 911 Fee from ███████ its customers. If Virgin Mobile is required to assume the burden of the $1.00 911 Fee, Virgin Mobile would lose money on each new subscriber, significantly impairing the ability of Virgin Mobile to provide Lifeline services in Indiana. Boehm Decl. ¶ 32.

Amended Section 11 is preempted by 47 USC § 254(f) because it conflicts with and is an obstacle to the accomplishment of federal law. On the one hand, federal law prohibits Lifeline Providers from charging the consumer directly by redirecting a portion of the federal Lifeline subsidy to the Indiana 911 fund. On the other hand, requiring Lifeline Providers to absorb the 911 Fee into the cost of providing no fee Lifeline service, as well as to pay the retroactive 911 Fee for subscribers who were never collected from, will mean that providing such services becomes economically unviable, and Lifeline services will be significantly curtailed to Indiana's almost half-a-million residents who qualify for the benefit. Because there is no interpretation of Amended Section 11 that does not conflict with federal law, Indiana's 911 Fee is preempted.

### 1. FCC Rules And Regulations Prohibit Lifeline Providers From Collecting The $1.00 911 Fee From Consumers.

One way in which an ETC could potentially recoup the $1.00 911 Fee from the subscriber is by reducing the amount of the benefit offered under the Lifeline program while still receiving the same amount of federal benefit. However, doing so is expressly prohibited by

federal law and FCC regulations, which require Lifeline Providers to "pass through the full amount of support to the qualifying low-income consumer." *See* 47 C.F.R. §54.403(a)(1); *see also* 47 USC § 254(e). As part of the compliance plan approval process by the Indiana Utility Regulatory Commission and the FCC, Lifeline Providers in Indiana are required to provide a no-cost Lifeline plan with at least 250 minutes. *See* Assurance ETC Order at 9. That 250 minute requirement ensures that the full $9.25 of the benefit provided by the federal government is received by the Lifeline subscribers, and not the Lifeline Providers or the states, as required by §54.403. If Assurance were to reduce the number of voice minutes provided under it no fee plans, it would simply be improperly converting the benefit approved by the FCC and the IURC to a 911 Fee to be paid to the State.

Virgin Mobile complies with both the regulations and the Assurance ETC Order by providing 250 "anytime" prepaid minutes per month, at no charge under Assurance's Lifeline plan. Additional minutes are available for $0.10/minute. *See* Assurance ETC Order, 9. In addition to free voice service, eligible subscribers also receive, at no additional charge, voicemail, caller I.D., and call waiting. *Id.* When the Indiana Commission approved Virgin Mobile's designation as Lifeline Provider, this plan was valued at $9.25, the full amount of the federal benefit. *See id.*; 47 C.F.R. §54.403(a)(1); *see also* 47 USC § 254(e). Virgin Mobile and other Lifeline Providers cannot simply avoid charging their subscribers the 911 Fee by simply reducing the number of minutes provided.

In addition to the legal restrictions on doing so, directly billing the consumer the $1.00 911 Fee is not possible from a practical perspective. Because Lifeline is a no fee service, Assurance does not have the ability to bill consumers directly for any amount without notice to the IURC. Even if the administrative mechanisms for billing existed, collecting the 911 Fee from

the consumer directly is inherently detrimental to the Lifeline program. Of Assurance customers, over ███████████████ make less than ████████ a year. Almost ████████ do not have access to the internet for personal use, and ████████ of customers have access to a debit or a credit card. Boehm Decl. at ¶¶ 9, 10. If Assurance Wireless required a credit card to access the Lifeline benefits, ████████████ eligible beneficiaries would be shut out of the market. Moreover, there is an opportunity cost associated with charging even a small amount for services that could be offered for free. Lifeline serves the most economically disadvantaged segment of the population, and individuals who might otherwise access the benefit may be understandably reluctant to do so if there was an associated cost, no matter how small. *In re Lifeline and Link Up Reform and Modernization,* 27 FCC Rcd. 6656, at 6772, ¶ 267 (F.C.C. February 6, 2012) ("The Lifeline program is serving the truly neediest of the population in the most dire economic circumstance and for whom even a routine charge is an excessive financial burden.") Adding the 911 Fee to any Top-Up transactions is similarly ineffective. ████████ of Lifeline subscribers have ever purchased additional minutes. Boehm Decl. ¶ 28. Accordingly, it is impossible to reach ████████████ subscribers through this method, even if it were allowable under federal and state law.

Therefore, Federal law effectively prohibits Lifeline Providers from collecting the $1.00 911 Fee imposed by Amended Section 11. Accordingly, the only interpretation of Amended Section 11 that does not directly conflict with federal law is to require the carrier to absorb the 911 Fee in the cost of providing Lifeline service. As discussed in Section B below, because doing so would present a substantial obstacle to the policy objectives of Congress, that interpretation is also preempted.

**2.** **Requiring Lifeline Providers To Pay The $1.00 911 Fee Will Frustrate The Congressional Purpose Of Providing Lifeline Services In The State Of Indiana.**

Because the 911 Fee cannot legally be collected from the subscriber, the only remaining possible interpretation of Amended Section 11 requires the Lifeline Providers themselves to pay the 911 Fee. However, requiring all Lifeline Providers to bear the financial burden of the 911 Fee in the future, as well as the substantial burden of the lump sum retroactive payment, will render the Lifeline program financially impossible in the State of Indiana, creating an obstacle to the accomplishment and execution of the full objectives of Congress. *See Geier v. Am. Honda Motor Co.,* 529 U.S. 861, 881 (2000). Accordingly, Amended Section 11 is preempted.

A state law is preempted where, under the circumstances of a particular case, it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress; an inquiry that requires the court to consider the relationship between the federal and state law as they are interpreted and applied, not merely as they are written. *Jones v. Rath Packing Co*., 430 U.S. 519, 526 (1977). Courts "should not strain to find ways to reconcile federal law with seemingly conflicting state law." *PLIVA, Inc. v. Mensing,,* 131 S. Ct. 2567, 2579-80 (2011).

Imposing a $1.00 911 Fee on Virgin Mobile, which amounts to 10.8% of the USF support mechanism received by Virgin Mobile for each Lifeline customer, will cause Virgin Mobile to lose money on each new subscriber. Boehm Decl. at ¶ 32. Virgin Mobile estimates that it will lose between ███ and ███ per customer as a direct result of Amended Section 11. *Id.* As a direct result of the 911 Fee, Virgin Mobile will not be able to cover its expected costs of offering Lifeline services to Indiana's neediest consumers. Virgin Mobile is not alone in concluding that the $1.00 911 Fee will render the provision of Lifeline services in the State of Indiana unsustainable. Other Lifeline Providers have noted that they face similar exigencies, for example, TracFone has stated that implementation of the 911 Fee will make it uneconomic to

offer no charge Lifeline service in the State of Indiana. *TracFone Wireless, Inc., Emergency Petition for Declaratory Ruling*, at 21, WC Docket No. 11-42 (filed Oct. 23, 2014), attached hereto as Exhibit F.

Requiring providers to absorb a loss for the provision of Lifeline services in the State of Indiana represents a substantial obstacle to accomplishment of the Congressional goal of universal service. *See generally, Nextel Partners, Inc. v. Town of Amherst, NY,* 251 F. Supp. 2d 1187, 1195-96 (W.D.N.Y. 2003) (municipality's zoning decision violated the 1996 Act's prohibition against State laws that effectively prohibit personal wireless service where it caused a significant gap in service). Amended Section 11 stands as a substantial obstacle to effectuating the congressional goal of universal service by rendering the provision of no charge Lifeline service, the only Lifeline service available to many Indiana consumers, unsustainable in the State of Indiana. This significant gap in the availability of Lifeline service to Indiana consumers presents an obstacle to the accomplishment of the congressional goal of universal service, and is thus preempted.

**B.     Amended Section 11 Violates the Fourteenth Amendment's Equal Protection Clause**

The Fourteenth Amendment's Equal Protection Clause provides that "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S CONST. amend. XIV, § 1. The clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). "In the absence of deprivation of a fundamental right or the existence of a suspect class, the proper standard of review is rational basis." *Srail v. Village of Lisle, III*, 588 F.3d 940, 943 (7th Cir. 2009) (citing *Vision Church v. Village of Long Grove*, 468 F.3d 975, 1000-1001 (7th Cir. 2006)). On its face, Amended Section 11 does not target a protected class or infringe upon fundamental

constitutional rights, and therefore, the level of scrutiny to apply is the rational basis test. Under a rational basis review, a plaintiff must prove that (1) the state actor intentionally treated plaintiff differently from others similarly situated; (2) this difference in treatment was caused by the plaintiff's membership in the class to which they belong; and (3) this different treatment was not rationally related to a legitimate state interest. *Srail*, 588 F.3d at 943 (citing *Smith v. City of Chicago,* 457 F.3d 643, 650–51 (7th Cir. 2006)).

All three prongs of this test are met in the instant case. Amended Section 11 singles out a class of wireless carriers statutorily classified as Lifeline Providers, who engage in the same business activity as other wireless providers in its plain language, and makes a distinction with respect to shifting the liability on both the retroactive and prospective obligations to pay 911 Fees to the Lifeline Providers themselves, but not to the non-Lifeline Providers. Accordingly, Amended Section 11 violates the Equal Protection Clause.

### 1. Disparate Liability Exposure Treats Lifeline Providers As A Singled Out Class

Indiana Code § 36-8-16.6-11(e) creates a singled out class, making significant distinctions in the treatment of Lifeline Providers and other wireless carriers not involved in the Lifeline program. Amended Section 11 offends Equal Protection for two reasons. First, it provides, in part, that a Lifeline Provider "shall pay to the 911 Board … a charge equal to the product of … (A) The enhanced prepaid wireless charge established under subsection (a)" and the "number of unique end users *for which the provider received reimbursement from the universal service fund* during the immediately preceding month." I.C. § 36-8-16.6-11(e)(2)(A) – (B) (emphasis added). This is the ongoing and prospective obligation imposed on Lifeline Providers, but not non-Lifeline Providers engaged in the same business. Second, Amended Section 11(e)(1)(A) – (C) creates a retroactive obligation exclusively imposed on Lifeline

Providers. Specifically, the retroactive provision requires Lifeline Providers to pay to the board a one-time fee of $1.00 for every end user the Lifeline Provider has as of July 2015 multiplied by the number of months that the Lifeline Provider received reimbursement from the universal service fund through the origination date of the end user's current service agreement. A plain reading of this statute makes clear that Indiana specifically intends to single out Lifeline Providers by imposing both a retroactive and prospective obligation and financial burden not experienced by their non-Lifeline Provider wireless provider counterparts.

Additionally, under the previous Section 11, prepaid wireless customers were assessed a 911 Fee of $0.50, and the current "standard user," which include landline and post-paid wireless customers, were assessed a 911 Fee of $0.90. I.C. § 36-8-16.6-11(a); I.C. § 36-8-16.7-32(a). Both these fees under Amended Section 11 are now $1.00. A retroactive application of this statute would in effect require Lifeline Providers and subscribers to pay an extra 50 cents per month retroactively to the start of that customer's current service agreement. The end result of Amended Section 11, from just its retroactive application, creates a two-tiered system of disparate treatment based on (1) the obligation to pay 911 back fees and (2) the 911 Fee amount in itself.

With respect to obligations and liabilities, as applied, Lifeline Providers such as Virgin Mobile will be assessed, and ultimately be 100% responsible for the 911 Fees associated with its Lifeline subscriber base. Non-Lifeline Providers, on the other hand, are completely void of responsibility to pay the same fees because the consumers, not the providers are responsible for the 911 Fee, and those providers pass that cost on to the consumer, with no penalty to the provider if the consumer fails to pay. I.C. § 36-8-16.7-32; I.C. § 36-8-16.7-33. Non-Lifeline Providers have no obligation to even *pursue* the collection of these fees from their consumer

base. I.C. § 36-8-16.7-34. Moreover, non-Lifeline Providers are entitled to retain 1% of the collected fees to cover the transactional costs of collection and remittance of the 911 Fee. I.C. § 36-8-16.7-33. The retroactive mechanism under Section 11(e)(1) imposes an even greater financial obligation on Lifeline Providers, which is never realized by their non-Lifeline counterparts. Thus, Amended Section 11 is a specially carved out exception creating a significant burden and liability on Lifeline Providers and their Lifeline subscribers, both prospectively and retroactively, while at the same time allowing non-Lifeline Providers to pass through unaffected.

To further complicate matters both retroactively and prospectively is the fact that as routine practice, when Lifeline subscribers Top-Up on their service, they are assessed another 911 Fee at the time of the retail transaction. Boehm Decl. ¶ 31. This creates an issue of double recovery for the same 911 Fee by the board when complying with Amended Section 11. For example, if Virgin Mobile already forwarded the 911 payment for a given month, but subsequently in the same month a subscriber Topped-Up his service, that subscriber would be paying a second fee, duplicating the contribution already paid for by Virgin Mobile. Boehm Decl. ¶ 31. Retroactively, this same problem arises. Theoretically, when Virgin Mobile makes its one-time payment under Section 11(e)(1), it would include numerous duplicative payments already made by those subscribers who Topped-Up in a given month and were assessed the 911 Fee at the point of sale. Thus, not only is Amended Section 11 discriminatory on its face, the 911 fund will be receiving double the fees in months where Lifeline Providers make a payment and their subscribers Top-Up their service—both on a retroactive and prospective basis. None of the foregoing are of any concern to non-Lifeline Providers.

2.      **The Disparate Treatment of Lifeline Providers Is Not Rationally Related To A Legitimate Goal**

The Supreme Court has emphasized that "if the constitutional conception of 'equal protection laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate government interest." *United States Dept. of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973). Of course the uninterrupted and continued maintenance of Indiana's 911 system is an important and legitimate purpose; however, Amended Section 11 does not reach that goal. Rather, it overreaches by obligating Lifeline Providers such as Virgin Mobile to ensure 100% payment for each and every Lifeline subscriber, while allowing non-Lifeline Providers and their customers the opportunity to not collect or pay the very same 911 Fees. The bottom lines of non-Lifeline Providers, however, are unaffected by Amended Section 11, regardless of whether the 911 Fees are remitted by their customer base. It makes no sense to financially burden Lifeline Providers participating in a federally-funded program for the underprivileged where margins are extremely limited, while at the same time imposing zero obligation on non-Lifeline Providers for the exact same 911 Fees. This result is not rationally related to any state interest, and is therefore unconstitutional and cannot stand.

The decision in *Consolidated Edison Co. of NY, Inc. v. Pataki*, 117 F. Supp. 2d 257 (N.D.N.Y. 2000), *aff'd and remanded,* 292 F.3d 338 (2d Cir. 2002) is instructive. There the Court recognized that if it determined "that the legislature acted arbitrarily or classified Plaintiff upon some ground not having a fair and substantial relation to the object of the act, such that similarly situated persons are treated differently, ***it must strike down the statute***." *Id.* at 262-63 (citing *Reed v. Reed*, 404 U.S. 71, 76 (1971)) (emphasis added). In that case, plaintiff-utility company challenged the constitutionality of a law, which prohibited it from recovering from its

ratepayers costs associated with replacing power as a result of an outage at the utility's nuclear plant. The court took issue with the legislators' classification of plaintiff in that the law "singles out Plaintiff with unparalleled specificity." *Id.* at 264. In holding the law at issue unconstitutional, the court saw "absolutely no difference" between the classification of plaintiff and others similarly situated and engaged in the same business. *Id.*

The court illustrated that under the challenged law, another energy provider was entitled to pass replacement costs onto its customers until a determination was made that the costs were incurred due to that energy provider's negligence. Under the challenged law, however, "***Plaintiff was denied this same exact right*** because its negligence involved the use of a specific model of generator. In essence, Defendants want[ed] [the] Court to accept the premise that because only Plaintiff could be negligent as to these specific model generators it did not have to draft a statute that applied to other similarly situated nuclear power plant operators." *Pataki*, 117 F. Supp. 2d at 264 (emphasis added). This is the type of exclusionary legislation the Equal Protection Clause seeks to prohibit. The court pointed to the reasoning in a previous decision to illustrate the irrational and unequal treatment of the law at issue:

> The fact that the terms of a statute, if drafted in such a way that it applied to all like-situated individuals, would in the legislature's estimation actually affect only one of those individuals does not justify drafting the statute in such a way that it applies only to that individual and not to the others who are similarly situated. This is akin to a small community, believing that one particular individual is prone to steal automobiles, passing an ordinance prohibiting that individual from stealing automobiles but not imposing a similar prohibition on all others in the community. Clearly, such an ordinance would offend the "element of neutrality that must always characterize the performance of the sovereign's duty to govern impartially."

*Id.* (quoting *Long Island Lighting Co. v. Cuomo*, 666 F. Supp. 370, 424 (N.D.N.Y. 1987)). The facts surrounding Amended Section 11, Lifeline Providers, and the Lifeline program are no

different than the foregoing example. Lifeline Providers are being singled out under Amended Section 11, and that disparate treatment has no rational relationship to a legitimate state interest.

Similarly, in *Santos v. City of Houston, Texas*, 852 F. Supp. 601 (S.D. Tex. 1994) the court found an anti-jitney ordinance, which prohibited jitney buses from operating within city bounds, in violation of the Equal Protection Clause. The *Santos* court noted that "a statute based on pure favoritism which creates a closed class will likely be declared unconstitutional." *Id.* at 607-608 (citing *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 470 (1981)). The *Santos* court found the anti-jitney ordinance at issue to be "merely the result of the jitney business being used as a pawn in a chess game between the City and the Houston Electric Company [and] has no rational basis." *Id.* at 608. "As a result, jitneys have been excluded from operating on city streets, while numerous other forms of similarly situated business entities providing ground transportation have been operating without restriction. … The City attempts to distinguish jitneys from other types of small body vehicles to justify the ordinance, but lack of summary judgment evidence and plain common sense defy the City's logic. The classification is simply not rational." *Id.* at 608.

The facts and rationale behind the challenged laws at issue in *Pataki*, *Cuomo*, and *Santos* are analogous to the case at hand. A finding that Amended Section 11 violates the Equal Protection Clause is therefore, in order. Indiana cannot specially carve out retroactive and prospective obligations imposed only on Lifeline Providers for the purpose of contributing to its 911 fund. By doing so, Indiana legislators directly infringe on the protections provided by the Fourteenth Amendment's Equal Protection Clause. States simply cannot pass legislation imposing a higher burden on one class, while allowing others engaged in the exact same business

a free pass. Amended Section 11 is facially discriminatory and violates the Equal Protection Clause.

Given the foregoing, Amended Section 11 clearly meets all three prongs of the Equal Protection Clause rational basis test, and should be declared unconstitutional. Because Amended Section 11 is both preempted and unconstitutional, Virgin Mobile has clearly demonstrated a likelihood of success on the merits of its claims, and is entitled to a preliminary injunction.

## II. AMENDED SECTION 11 WILL CAUSE IRREPARABLE INJURY IF IT IS ALLOWED TO TAKE EFFECT

In the absence of injunctive relief, Virgin Mobile will suffer substantial injury to its ability to provide Lifeline service in Indiana. Boehm Decl. ¶¶ 32-33; s*ee also Ty, Inc. v. W. Highland Publ'g, Inc.*, No. 98 C 4091, 1998 WL 698922, at * 19 (N.D. Ill. Oct. 5, 1998) (inadequate remedy at law and irreparable harm elements often merged because they involve the same analysis). First, Virgin Mobile will be foreclosed from serving approximately ██ of its customers if it is required to pass the costs on to consumers, many of whom do not have a credit card, and will lose between ███ and ███ for each new customer that is served. Boehm Decl. ¶ 10, 32. This financial injury through the loss of business, as well as harm to the goodwill associated with its Assurance Wireless brand, is sufficient evidence to find that Virgin Mobile has no adequate remedy at law if the Court does not enjoin the effect of Amended Section 11. *Merrill Lynch v. Salvano,* 999 F.2d 211, 215 (7th Cir. 1993) (upholding finding that loss of clients "is a harm for which there is no adequate legal remedy"). Moreover, Virgin Mobile has no ability to recover such damages, constituting irreparable injury. *See Iowa Utils. Bd. v. FCC,* 109 F.3d 418, 426 (8th Cir. 1996) ("threat of unrecoverable economic loss ... does qualify as irreparable harm"). Accordingly, Virgin Mobile has demonstrated irreparable harm.

Enforcing the amended law will result in Virgin Mobile losing money and not being able to sustain its continued offering of Lifeline benefits in Indiana. Even if Virgin Mobile prevails on the merits of its claims at a later date, absent injunctive relief the harm suffered by the economic burden of the 911 Fee will not be repairable. Indiana has already seen a marked decline in the participation of Lifeline subscribers, and given the adverse economic effect of Amended Section 11 on Virgin Mobile, it is likely that there will be a material reduction not only in those customers served by Virgin Mobile, but also a material reduction in the number of overall Lifeline subscribers in Indiana. *See* Boehm Decl. ¶ 7. The inability to remain in business is *per se* an irreparable harm warranting injunctive relief. *United Asset Coverage, Inc., v. Avaya Inc.,* 409 F. Supp. 2d 1008, 1039 (N.D. Ill. 2006).

More importantly, if Virgin Mobile were to exit or substantially reduce the Indiana market for Lifeline subscribers, the harm would be twofold. First, again, this loss in business and ability to operate in Indiana is a harm exclusively incurred by Virgin Mobile and other similarly situated Lifeline Providers. Second, Virgin Mobile's Lifeline subscriber base would be directly impacted by the loss of service. If Virgin Mobile were to exit the Indiana market, there is no reason to believe that other similarly situated Lifeline Providers would not do the same. Under these circumstances, Lifeline subscribers in Indiana would face the hardship of not having access to reliable wireless service that so many of them depend on as a point of contact for friends and family, prospective employers, health care providers and social services programs.

Given the foregoing, Virgin Mobile will suffer irreparable injury if Amended Section 11 is allowed to go into effect.

## III.  THE BALANCE OF EQUITIES AND PUBLIC POLICY FAVOR AN INJUNCTION

The Seventh Circuit uses a sliding scale approach to determine the balance of harms—the more likely a plaintiff will succeed on the merits, the less the balance of irreparable harms must favor the plaintiff's position. *Kastanis v. Eggstacy LLC*, 752 F. Supp. 2d 842, 858 (N.D. Ill. 2010); *see also Planned Parenthood v. Doyle*, 162 F.3d 463, 465 (7th Cir. 1998) ("[t]he stronger the likelihood that the plaintiff will win, the less of a showing he need make that the denial of the preliminary injunction would hurt him more than granting it would hurt the defendant.")  Virgin Mobile has demonstrated that Amended Section 11 is preempted and unconstitutional.  Based on this strong likelihood of succeeding on the merits, the balance of the equities favors enjoining enforcement of Section 11.  Moreover, Virgin Mobile will suffer an immediate harm when amended Section 11 takes effect.

Most importantly, the public itself will also be harmed without injunctive relief. Whether an injunction is in the public interest entails anticipating the effect that granting or denying preliminary injunctive relief will have on non-parties.  *Ty, Inc.*, 1998 WL 698922 at * 21. "It is ... the public interest enunciated in the [federal] legislation which serves as the criterion for the proper exercise of equity powers." *SEC v. Advance Growth Capital Corp.*, 470 F.2d 40, 53 (7th Cir. 1972). Thus, Congress and the FCC have already defined the public interest, and "[a] district court cannot . . .  override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited" or permitted.  *U.S. v. Oakland Cannabis*, 532 U.S. 483, 497-98 (2001). Accordingly, "[o]nce Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is ... for the courts to enforce them when enforcement is sought." *Id.* (quoting *Hill,* 437 U.S. 153, 194 (1978)).

The Seventh Circuit has admonished that it "should not hesitate to reverse an order denying such [injunctive] relief when it is evident that the trial court's discretion has not been exercised to effectuate the manifest objectives of the specific legislation involved" - here, the Universal Service provisions of the 1996 Act - to ensure that congressional policy is not "frustrated by judicial inaction*." Advance Growth*, 470 F.2d at 53. The public policy as enunciated by Congress is to facilitate the provision of Lifeline service so that all Americans have access to the benefit of reliable phone service. If Amended Section 11 is enforced, Indiana Lifeline services will be substantially impaired, cutting off thousands of economically disadvantaged customers from federal benefits. Indiana's most vulnerable citizens will be foreclosed from accessing telephone service – a result that Congress has already determined is detrimental to their ability to fully participate in society. The national public policy of universal telephone service hinges on the ability of ETCs to provide Lifeline service in Indiana. Eliminating Assurance Wireless' service to some Lifeline customers directly subverts that public policy by decreasing competition and consumer choice, and widening the gap of unserved customers. Accordingly, the public interest strongly favors an injunction.

## CONCLUSION

Because Virgin Mobile has shown that its business would be irreparably harmed if Amended Section 11 were to take effect, that it has a strong likelihood of succeeding on the merits, and that the balancing of the harms to the parties (and the potential negative effects of Amended Section 11 on thousands of nonparty Indiana citizens) weighs heavily in favor of granting the present motion, Virgin Mobile respectfully requests that this honorable Court grant the present motion, enjoining Amended Section 11 from taking effect pending the resolution of the underlying action.

DATED:      July 15, 2015                    Respectfully submitted,

__s/ Richard E. Aikman_____
Richard E. Aikman
Anne E. Becker
Lewis Kappes
One American Square, Suite 2500
Indianapolis, Indiana 46282
(317) 639-1210
(317) 639-4882 (Fax)
RAikman@Lewis-Kappes.com
ABecker@Lewis-Kappes.com

Henry T. Kelly (*pro hac vice pending*)
Catherine E. James (*pro hac vice pending*)
Kelley Drye & Warren, LLP
333 W. Wacker Drive, Suite 2600
Chicago, Illinois 60606
(312) 857-2350
(312) 857-7095 (Fax)
HKelly@KelleyDrye.com
CJames@KelleyDrye.com

## CERTIFICATE OF SERVICE

The undersigned, an attorney of record, hereby certifies that on July 15, 2015 a copy of the foregoing **Memorandum In Support of Motion For Temporary Restraining Order and Preliminary Injunction and Exhibits Thereto** was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system. Parties may access this filing through the court's system. In addition, the undersigned certifies that he caused the foregoing **Memorandum In Support of Motion For Temporary Restraining Order and Preliminary Injunction and Exhibits Thereto** to be served upon the below individuals via hand delivery on the 16th day of July, 2015.

Michael R. Pence
Office of the Governor
200 W. Washington St., Rm. 206
Indianapolis, IN 46204

David L. Steiner
Office of Attorney General
Indiana Govt. Center South, 5th Floor
302 W. Washington St.
Indianapolis, IN 46204

Barry Ritter
Indiana Statewide 911 Board
10 W. Market St., Ste. 2950
Indianapolis, IN 46204

_____ s/ Richard E. Aikman _____
          Richard E. Aikman